# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES C. MONAGHAN, Individually and on Behalf of All Others Similarly Situated and on Behalf of the JPMORGAN CHASE 401(K) SAVINGS PLAN,<br><br>Plaintiff,<br><br>v.<br><br>JPMORGAN CHASE & CO, JPMORGAN CHASE BANK, N.A., J.P. MORGAN INVESTMENT MANAGEMENT INC., JPMORGAN CHASE 401(K) SAVINGS PLAN SELECTION COMMITTEE, EMPLOYEE PLANS INVESTMENT COMMITTEE, JAMES DIMON, LEE R. RAYMOND, STEPHEN B. BURKE, WILLIAM C. WELDON, CRANDALL C. BOWLES, JAMES S. CROWN, LABAN P. JACKSON, JR., MICHAEL A. NEAL, LINDA B. BAMMANN, TIMOTHY P. FLYNN, JAMES A. BELL, DAVID M. COTE, ELLEN V. FUTTER, DOUGLAS L. BRAUNSTEIN, MARIANNE LAKE, JOHN L. DONNELLY, BERNADETTE J. BRANOSKY and JOHN DOES 1-20,<br><br>Defendants. | Civil Action No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT (ERISA)<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT

This is a class action brought pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 *et seq.* ("ERISA").  Plaintiff James C. Monaghan, individually and on behalf of all others similarly situated, by ant through his attorneys, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, *inter alia*, a review of U.S. Securities and Exchange Commission ("SEC") and U.S. Department of Labor ("DOL") filings by JPMorgan Chase & Co. ("JPMorgan" or the "Company"), as well as defined contribution plan documents, media reports and court filings about the Company, and an analysis of available fund and investment information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Plaintiff, individually and as a representative of the Class described herein, and on behalf of the JPMorgan Chase 401(k) Savings Plan (the "Plan"), brings this action against JPMorgan Chase Bank, N.A. ("JPM Bank"), a wholly owned bank subsidiary of JPMorgan, and other Plan fiduciaries. As described herein, defendants breached their fiduciary duties to the detriment of the Plan and its participants and beneficiaries by violating their duties of loyalty and prudence under ERISA, and by failing to adequately monitor the Plan's co-fiduciaries.

2.      ERISA imposes strict fiduciary duties of prudence and loyalty on fiduciaries for ERISA covered retirement plans. ERISA §404(a)(1), 29 U.S.C. §1104(a)(1). These duties, which require fiduciaries to act "solely in the interest of [plan] participants and beneficiaries," 29 U.S.C. §1104(a)(1), are "the 'highest known to the law.'" *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (citation omitted); *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007). Defendants violated these duties by loading the Plan with proprietary fund investment options that charged excessively high fees that

inured to the benefit of affiliates of JPMorgan and one of JPMorgan's closest business partners, BlackRock Institutional Trust Company, N.A. ("BlackRock"), at the expense of Plan participants.

3.      JPMorgan is a recognized leader in the financial services industry. Each year, thousands of its former and current employees invest hundreds of millions of dollars in the Plan. Participants trusted that, as Plan fiduciaries and skilled investment professionals, defendants would construct an exemplar retirement plan that afforded its participants – its own employees – the opportunity to safely put away money in an efficient and effective manner without self-dealing. Instead of acting for the exclusive benefit of the Plan and its participants and beneficiaries, defendants acted for the benefit of themselves – by forcing the Plan into costly investments managed by JPMorgan and BlackRock. Rather than engage in a systematic, arm's-length review of available Plan investment options, JPMorgan sought out investment options that allowed its affiliates and business partners to reap outsized fees to the detriment of plaintiff and members of the Class. During the Class Period (defined herein), *half* of all Plan investment options were affiliated with JPMorgan entities, while more than *70%* were affiliated with either JPMorgan or BlackRock.

4.      As fiduciaries of one of the largest 401(k) plans in the United States, with over $20 billion in Plan assets, defendants had available to them low-cost structures for Plan investments, such as separate accounts or collective trusts, with significantly lower recordkeeping and administrative costs. The large size of the Plan also allowed defendants to take advantage of economies of scale and leverage low-cost investment management options that are generally not available to other, smaller investors. Nevertheless, defendants structured several proprietary funds managed by a JPMorgan affiliate, J.P. Morgan Investment Management Inc. ("JPMIM"), as more expensive mutual funds and placed them as investment options in the Plan.

5.      These funds were also actively managed, and therefore charged higher fees, even though passively managed investment options were available that would have allowed Plan

beneficiaries to utilize similar strategies during the Class Period at a significantly lower cost. For most of the Class Period, these JPMorgan-affiliated investment options were the priciest in the Plan. For example, the JPMIM-managed Mid Cap Growth Fund charged fees of 0.93%, while the Vanguard Mid-Cap Growth Index Fund Admiral also utilized a mid-cap growth strategy and had an annualized expense ratio of only 0.08%

6.      Similarly, instead of conducting arm's-length negotiations to offer the best investment options at the lowest cost, JPMorgan gave preferential treatment to its longtime business partner, BlackRock, in selecting Plan investment options. BlackRock is the largest asset manager in the world, with over $5 trillion in assets directly under management as of December 31, 2016, and it is one of JPMorgan's largest clients and shareholders. Defendants favored furthering JPMorgan's business relationship with BlackRock over the interests of Plan beneficiaries by choosing excessively expensive BlackRock-managed funds for the Plan and by funneling a large portion of the Target Date Funds, which made up 9 of 30 investment options, into BlackRock-managed funds. During the Class Period, JPMorgan and BlackRock affiliated funds constituted over 70% of all Plan investment options. On January 25, 2017, in a stunning example of their tight-knit business relationship, BlackRock shifted *$1 trillion* of its assets under management into JPMorgan custody, in one of the largest asset transfers of all time. JPMorgan will reportedly earn tens of millions of dollars in annual fees from this arrangement.[1]

7.      In early 2014, the Office of the Comptroller of the Currency began investigating whether JPMorgan and JPM Bank had improperly funneled client assets into JPMorgan-affiliated

---

[1] *See* Sabrina Willmer, Charles Stein & Hugh Son, *BlackRock's $1 Trillion JPMorgan Move Shows Cost Strategy*, Bloomberg, Jan. 25, 2017, *available at* https://www.bloomberg.com/news/articles/2017-01-25/blackrock-to-move-1-trillion-to-jpmorgan-from-state-street.

funds rather than third-party investment options in order to generate investment fees. The SEC subsequently opened its own probe into the matter, culminating in a $267 million settlement and cease-and-desist order with the SEC (the "SEC Order") and an additional $40 million settlement with the U.S. Commodities Futures Trading Commission ("CFTC") announced in December 2015. According to the SEC Order, JPM Bank and J.P. Morgan Securities LLC ("JPM Securities"), another JPMorgan subsidiary, systematically funneled client assets into proprietary JPMorgan funds without disclosing this conflict of interest to clients. The SEC Order also found that these entities had breached their fiduciary duties by favoring JPMorgan-affiliated funds and by failing to advise JPMorgan clients of the availability of certain less-expensive mutual fund share classes. In addition, the SEC Order revealed that JPM Bank had failed to disclose its receipt of retrocession payments from third-party investment managers in exchange for funneling client assets into funds managed by these third parties. These payments amounted to a type of kickback, whereby JPM Bank received fees from third-party investment managers for placing client assets with them. According to the SEC Order, JPM Bank failed to disclose that it had sought out and almost exclusively used third-party investment managers willing to pay retrocessions that would benefit JPM Bank, rather than its clients.

8.     As intense scrutiny fell on JPM Bank's self-dealing as a result of the SEC investigation, JPM Bank began to belatedly reduce the fees charged by its proprietary funds and by BlackRock funds to Plan beneficiaries, and in some cases eliminated these investment options altogether. For example, effective November 6, 2015, the Mid Cap Growth Fund, a JPMIM-managed fund that was the most expensive Plan option, was eliminated from the Plan in favor of the S&P Mid Cap 400 Index Fund. Fees for this "mid cap" investment option subsequently plummeted from 0.93% to 0.04%, a ***96% reduction***. Similarly, the Core Bond Fund and the Small Cap Core Fund, both actively managed by JPMIM, were restructured into a lower cost collective trust and a lower cost separate account,

respectively. As a result of these lower cost formats, fees for these funds dropped from 0.40% and 0.82%, respectively, to *zero* for Plan participants. In the end, the Plan belatedly slashed fees across nearly *all* of its JPMorgan- and BlackRock-affiliated funds following the federal investigations, while conspicuously leaving untouched fees for non-affiliated investment options.

9.     While the regulatory scrutiny and uncovering of systematic self-dealing and fiduciary breaches by JPM Bank and other JPMorgan affiliates has spurred much needed expense reform in the Plan, Plan beneficiaries had already paid tens of millions of dollars in excessive fees during the Class Period. Even small differences in fees can result in vast differences in the amount of savings available at retirement. According to the DOL, even a 1% difference in fees and expenses can reduce the funds available for retirement by 28% by the end of a beneficiary's career. [2] Thus, the harm to plaintiff, the Plan and the Class from defendants' disloyalty and imprudence has compounded over time, as the tens of millions of dollars in excessive fees defendants have charged the Plan to enrich themselves and their affiliates in violation of ERISA have detracted from participants' available investment capital.

10.     To remedy these fiduciary breaches, plaintiff, individually and as a representative of a Class of participants and beneficiaries in the Plan, brings this action on behalf of the Plan under ERISA §§404, 406, 409, and 502(a)(2) and (a)(3), 29 U.S.C. §§1104, 1106, 1109, and 1132(a)(2) and (a)(3), to make good to the Plan all losses resulting from each breach of fiduciary duty and restore to the Plan any profits made through defendants' imprudent and disloyal use of the Plan's assets. In addition, plaintiff seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

---

[2] *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1-2 (Aug. 2013), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf.

11.    Plaintiff brings this action pursuant to 29 U.S.C. §1132(a)(2) and (3), which provide that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and exclusive jurisdiction under 29 U.S.C. §1132(e)(1).

13.    Venue is proper in this District pursuant to 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b). At least one of the alleged breaches of fiduciary duty took place, and at least one defendant may be found, in this District.

## PARTIES

**Plaintiff**

14.    Plaintiff James C. Monaghan was a participant of the JPMorgan Chase 401(k) Savings Plan (defined herein as the "Plan") during the Class Period. As a participant, plaintiff has invested, *inter alia*, in the Core Bond Fund, Mid Cap Growth Fund, Small Cap Core Fund, International Large Cap Index Fund, Target Date Funds, and various other investment options that were offered by the Plan and managed by JPMorgan and/or BlackRock affiliated entities during the Class Period.

**Defendants**

***Corporate Defendants***

15.    Defendant JPMorgan Chase & Co. (defined herein as "JPMorgan") is a global financial services firm with worldwide operations. It is the corporate parent of JPM Bank, which is its wholly owned, primary banking subsidiary. JPMorgan is incorporated in Delaware and has its headquarters in New York, New York.

16.    Defendant JPMorgan Chase Bank, N.A. (defined herein as "JPM Bank") is the Plan Sponsor and is a national banking subsidiary of JPMorgan. JPM Bank is headquartered in Columbus, Ohio, with retail branches in 23 states, as well as foreign branches and subsidiaries in a variety of countries. JPM Bank is also the Plan Trustee, Plan Asset Manager, and currently the sponsor/fund manager of 12 of the investment options in the Plan.

17.    Defendant J.P. Morgan Investment Management Inc. (defined herein as "JPMIM") is a subsidiary of JPMorgan and an investment advisor for several investment options in the Plan. JPMIM, a registered investment advisor, is a corporation organized under the laws of Delaware with its principal office in New York, New York. For most of the Class Period, it was the investment advisor for the Core Bond Fund, the Small Cap Core Fund and the Mid Cap Growth Fund, and received investment fees and other payments from the Plan for its management of these funds.

18.    Defendants JPMorgan, JPM Bank and JPMIM are referred to herein as the "Corporate Defendants." The Corporate Defendants were fiduciaries of the Plan because they exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.

***Director Defendants***

19.    Defendant James Dimon was Chairman of the Board of Directors of JPMorgan ("JPMorgan Board") and a member of the Board of Directors of JPM Bank (the "JPM Bank Board") at all relevant times. In addition, defendant Dimon was the Chief Executive Officer ("CEO") and President of JPMorgan and JPM Bank.

20.    Defendant Lee R. Raymond was on the JPMorgan Board at all relevant times and the Chairman of the Compensation & Management Development Committee of the JPMorgan Board ("CMDC"). He is also a member of the JPM Bank Board.

21.    Defendant Stephen B. Burke was on the JPMorgan Board at all relevant times, as well as a member of the CMDC. He is also a member of the JPM Bank Board.

22.    Defendant William C. Weldon was on the JPMorgan Board at all relevant times, as well as a member of the CMDC. He is also the Non-Executive Chairman of the JPM Bank Board.

23.    Defendant Crandall C. Bowles was on the JPMorgan Board at all relevant times. He is also a member of the JPM Bank Board.

24.    Defendant James S. Crown was on the JPMorgan Board at all relevant times. He is also a member of the JPM Bank Board.

25.    Defendant Laban P. Jackson, Jr. was on the JPMorgan Board at all relevant times. He is also a member of the JPM Bank Board.

26.    Defendant Michael A. Neal has been a member of the JPMorgan Board since 2014. He is also a member of the JPM Bank Board.

27.    Defendant Linda B. Bammann has been a member of the JPMorgan Board since 2013. She is also a member of the JPM Bank Board.

28.    Defendant Timothy P. Flynn has been a member of the JPMorgan Board since 2012. He is also a member of the JPM Bank Board.

29.    Defendant James A. Bell has been a member of the JPMorgan Board since 2011. He is also a member of the JPM Bank Board.

30.    Defendant David M. Cote served on the JPMorgan Board at all relevant times until 2013.

31.    Defendant Ellen V. Futter served on the JPMorgan Board at all relevant times until 2013.

32.    The defendants listed in ¶¶19-31 are referred to herein as the "Director Defendants." At all times, the Corporate Defendants acted through the Director Defendants to perform Plan-related

fiduciary functions in the course and scope of their employment. As members of the JPMorgan Board and/or the JPM Bank Board, the Director Defendants served as Plan fiduciaries, because they exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets. The Director Defendants had authority and responsibility over the appointment of members of the JPMorgan Chase 401(k) Savings Plan Selection Committee ("Plan Selection Committee"), who selected the members of the Employee Plans Investment Committee ("EPIC"), and the Plan Administrator, which they did through the CMDC, a committee of the JPMorgan Board, and thus had the authority and discretion to make changes to the Plan, monitor the performance of other Plan fiduciaries, and to oversee the Plan and its performance and the disposition of Plan assets. The CMDC was appointed by the Director Defendants to approve the delegation of authority to JPMorgan's Head of Human Resources and Chief Financial Officer ("CFO") as members of the Plan Selection Committee and to appoint the Plan Administrator, approve fiduciary rules for the Plan, approve the compensation for any Plan fiduciary who was not a JPMorgan employee, and receive reports regarding the operation of the Plan.

### Investment Defendants

33.    Defendant Douglas L. Braunstein served as JPMorgan's CFO during the Class Period until defendant Marianne Lake assumed this position in January 2013. At all relevant times, defendant John L. Donnelly was JPMorgan's Head of Human Resources. In these roles, these defendants served on the Plan Selection Committee and had the discretion and authority to appoint and remove the members of EPIC. In this way, these defendants, who were named fiduciaries for the Plan, exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets.

34.    Defendant JPMorgan Chase 401(k) Savings Plan Selection Committee (defined herein as the "Plan Selection Committee"), which acted as a named fiduciary under the Plan, had

the duty and authority to appoint members of EPIC. Unless the Director Defendants determined otherwise, the Plan Selection Committee consisted of JPMorgan's CFO and its Head of Human Resources, who were appointed and overseen by the Director Defendants.

35.    At all relevant times, defendant Bernadette J. Branosky served as the Benefits Manager for JPMorgan. In this role, she served as the Plan Administrator, was a named Plan fiduciary, and had the authority to control and manage the operation and administration of the Plan.

36.    Defendant Employee Plans Investment Committee (defined herein as "EPIC"), which acted as a named fiduciary under the Plan, was responsible for the control and management of all assets of the Plan other than the assets of the JPMorgan Chase Common Stock Fund. EPIC had the power to appoint, and did appoint, an investment manager to assume the asset management duties of the Plan and to appoint the trustee of the Plan. For both of these roles, EPIC selected JPM Bank. EPIC also established the investment policy and funding policy for the Plan, and reported to and was overseen by the Director Defendants. EPIC and its constituent members during the Class Period are named herein as defendants. Despite the due diligence of plaintiff's counsel, the identities of certain members of EPIC during the Class Period are not currently known to plaintiff.

37.    The defendants in ¶¶19-36 are referred to herein as the "Individual Defendants." By failing to properly discharge their fiduciary duties under ERISA, the Individual Defendants breached duties they owed to the Plan and its participants. Accordingly, the actions of these defendants are imputed to the Corporate Defendants under the doctrine of *respondeat superior*, and the Corporate Defendants are liable for these actions.

### Additional "John Doe" Defendants

38.    To the extent that there are additional officers and employees of JPM Bank, JPMorgan, JPMIM, or other entities who were fiduciaries of the Plan during the Class Period, including members of EPIC and/or the Plan Selection Committee, the identities of whom are

currently unknown to plaintiff, plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" defendants 1-20 include other individuals, including, but not limited to, JPMorgan, JPM Bank and JPMIM officers and employees and the members of EPIC and/or the Plan Selection Committee, who were fiduciaries of the Plan within the meaning of 29 U.S.C. §§1002(21) and/or 1102(a)(1) during the Class Period.

## SUBSTANTIVE ALLEGATIONS

### Defendants' Fiduciary Duties Under ERISA

39.    ERISA imposes strict fiduciary duties of loyalty and prudence upon defendants as fiduciaries of the Plan. These duties, which require fiduciaries to act "solely in the interest of [plan] participants and beneficiaries," 29 U.S.C. §1104(a)(1), are "'the highest known to law.'" *Howard*, 100 F.3d at 1488 (citation omitted); *LaScala*, 479 F.3d at 219. Section 1104(a)(1) states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)    for the exclusive purpose of:
>
> (i)    providing benefits to participants and their beneficiaries; and
>
> (ii)    defraying reasonable expenses of administering the plan;
>
> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims

29 U.S.C. §1104(a)(1).

40.     According to the DOL, the "*primary* responsibility of fiduciaries is to run the plan solely in the interest of participants and beneficiaries and for the exclusive purpose of providing benefits and paying plan expenses."[3] In addition, ERISA fiduciaries "must avoid conflicts of interest" and "may not engage in transactions on behalf of the plan that benefit parties related to the plan, such as other fiduciaries, services providers or the plan sponsor." *Id*. Thus, the duty of loyalty prohibits fiduciaries from acting in service of their own interests or those of a third party to the detriment of plan participants, including by charging or allowing to be charged excessive fees in plan investment options.

41.     ERISA "'imposes a "prudent person" standard by which to measure fiduciaries' investment decisions and disposition of assets.'" *Fifth Third Bancorp v. Dudenhoeffer*, __ U.S. __, 134 S. Ct. 2459, 2467 (2014) (citation omitted). This means that ERISA fiduciaries must discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. §1104(a)(1)(B). As the Uniform Prudent Investor Act ("UPIA") observes: "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obliged to minimize costs." UPIA §7 cmt.

42.     In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, __ U.S. __, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "'must dispose of it within a reasonable time.'" *Id*. (citation omitted). Fiduciaries therefore may be

---

[3] *See* Department of Labor, *Fiduciary Responsibilities*, https://www.dol.gov/general/topic/retirement/fiduciaryresp (last visited Feb. 23, 2017) (emphasis added).

held liable for either assembling an imprudent menu of investment options or for failing to monitor the plan's investment options to ensure that each option remains prudent.

43.    The general duties of loyalty and prudence imposed by 29 U.S.C. §1104 are supplemented by certain transactions that are expressly prohibited by 29 U.S.C. §1106, and are considered "per se" violations because they entail a high potential for abuse. Section 1106(a)(1) states, in pertinent part, that:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –
>
> (A)    sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> *       *       *
>
> (C)    furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

29 U.S.C. §1106(a)(1).

44.    Section 1106(b) further provides, in pertinent part, that:
A fiduciary with respect to a plan shall not –
> (1)    deal with the assets of the plan in his own interest or for his own account,
>
> (2)    in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or
>
> (3)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. §1106(b).

45.    ERISA also imposes co-fiduciary duties on plan fiduciaries for participating in, enabling or failing to remedy a breach by another fiduciary. Section 1105(a) states, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2)    if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

46.    Although ERISA fiduciaries must act "in accordance with the documents and instruments governing the plan," that duty exists only "insofar as such documents and instruments are consistent with" the other duties imposed upon fiduciaries by ERISA. 29 U.S.C. §1104(a)(1)(D). "This provision makes clear that the duty of prudence trumps the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary." *Dudenhoeffer*, 134 S. Ct. at 2468.

**Fees Substantially Impact Returns on Investment**

47.    In defined-contribution plans, such as the Plan, the amount of funds available to a participant at retirement are dependent upon the amount of contributions and the return on investment. Fees paid by a plan participant reduce the amount available for investment and negatively impact the total return on investment.

48.    As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-

contribution plan." *Tibble*, 135 S. Ct. at 1826. Because retirement savings in defined contribution plans grow and compound over the course of an employee-participant's career, excessive fees (as well as poor investment performance) can dramatically reduce the amount of funds available for a participant by the time of retirement. Over time, due to the power of compounding, even apparently minor differences in investment fees and performance can result in drastic differences in the funds available at retirement.

49.     The following example from the DOL illustrates how fees and expenses can impact a participant's retirement account:

> Assume that you are an employee with 35 years until retirement and a current 401(k) account balance of $25,000. If returns on investments in your account over the next 35 years average 7 percent and fees and expenses reduce your average returns by 0.5 percent, your account balance will grow to $227,000 at retirement, even if there are no further contributions to your account. If fees and expenses are 1.5 percent, however, your account balance will grow to only $163,000. The 1 percent difference in fees and expenses would reduce your account balance at retirement by 28 percent.[4]

**Very Few Actively Managed Funds Consistently Outperform
Market Indexes or Passively Managed Funds**

50.     During the Class Period, investment options within the Plan charged certain fees, to be paid by deductions from the pool of assets under management. Fees were in part determined by the level of the fund manager's activity involved in the selection of securities for the fund. Passively managed funds, also known as "index funds," attempt to mirror the components of a particular market index such as the Standard & Poor's 500. Conversely, actively managed funds select securities based on different strategies in an attempt to beat a designated benchmark. Because actively managed funds call for sophisticated research and judgment calls, they often carry significantly higher fees than those of passively managed funds.

---

[4] *A Look at 401(k) Plan Fees*, *supra*, at 1-2.

51.    Even though actively managed funds attempt to beat their comparative indexes, most actively managed funds are able to do so. As such, very few actively managed funds are able to outperform passively managed funds. Studies show that "most actively managed funds failed to survive and outperform their passive peers, especially over the trailing 10-year period."[5] In other words, "[t]he average dollar in passively managed funds typically outperformed the average dollar invested in actively managed funds."[6]

52.    Similarly, S&P DJI publishes the SPIVA U.S. Scorecard, a widely referenced research report which compares the performance of actively managed funds against their appropriate benchmarks. These reports have found that "relatively few active managers are able to outperform passive managers over any given time period, either short-term or long-term."[7] For instance, the mid-year 2016 Scorecard found that during the measured one-year period, 84.62% of large-cap managers, 87.89% of mid-cap managers, and 88.77% of small-cap managers underperformed the S&P 500, the S&P MidCap 400, and the S&P SmallCap 600 benchmarks, respectively.

53.    Accordingly, even though actively managed funds attempt to outperform their benchmarks, passively managed funds with comparable investment strategies charge lower fees and generally perform better over the long-term. According to an analysis by the investment research firm Morningstar, Inc. ("Morningstar"), "higher-cost funds are more likely to either underperform or be shuttered or merged away," while "lower-cost funds are not only more likely to survive, but also displayed greater odds of success."[8] The difference in fees and performance between actively and passively managed funds can dramatically impact returns over time.

---

[5] *See* Ben Johnson & Alex Bryan, *Morningstar's Active/Passive Barometer: Midyear 2016*, Morningstar, Aug. 2016, at 3, *available at* http://corporate1.morningstar.com/ResearchArticle.aspx?documentId=765534.
[6] *Id.*
[7] *See About Spiva*, https://us.spindices.com/spiva/#/about (last visited Feb. 24, 2017).
[8] *See* Johanna Bennett, *Morningstar: Active Fund Managers Suffice*, Barron's, Aug. 19, 2016, *available at* http://blogs.barrons.com/focusonfunds/2016/08/19/morningstar-active-fund-managers-suffer/.

54.     This difference can compound dramatically over time. According to a February 15, 2014 report by *The Atlantic*, the difference between the average cost of an actively managed fund and the lower cost of a passively managed fund can reduce retirement savings by more than six figures over the course of a career. For example, if a 25-year-old employee is offered two funds, a passively managed index fund with an 0.08% fee, and an actively managed fund with an 1.33% fee, and both funds achieve a 7% average annual return, and the employee contributes $3,000 every year, the employee would have considerably more money in the passively managed fund. The employee would have $15,000 more at age 45, $55,000 more at 55, $159,000 more at 65, and $257,000 more at 70 in the passively managed fund compared with the actively managed fund. "That's because you don't just lose the money you pay in fees. You lose the returns you could have had on the money you pay in fees, too."[9] This scenario is reflected in the following chart:[10]

---

[9] *See* Matthew O'Brien, *The Crushingly Expensive Mistake Killing Your Retirement*, The Atlantic, Feb. 15, 2014, *available at* https://www.theatlantic.com/business/archive/2014/02/the-crushingly-expensive-mistake-killing-your-retirement/283866/.

[10] *Id.*



**Large Retirement Plans Are Able to Lower the Cost of Investment Options**

55.        In addition to whether a fund is passively or actively managed, the way in which investment options are structured can also have an impact on the fees charged to plan participants. Generally, investment options in 401(k) plans can charge lower fees than comparable products outside of 401(k) plans. One reason for this is because, by pooling their money in a 401(k) plan, individual participants are able to diversify their investments, benefit from economies of scale and lower their transaction costs. According to a 2015 study by the Investment Company Institute, 401(k) mutual fund investors pay approximately 23% lower fees than non-401(k) equity mutual funds (the "2015 ICI Report").[11] This reduction in fees is inversely correlated with the size of the plan: the larger the plan, the lower the total fees. For example, according to the 2015 ICI Report, plans with more

---

[11] *See The ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2013* 48 (Dec. 2015), *available at* http://www.ici.org/pdf/ppr_15_dcplan_profile_401k.pdf.

than $1 billion in assets charged on average 75% lower fees than the average fees charged by plans with $1 million to $10 million in assets. [12]

56.    For the fiscal year ended December 31, 2015, the Plan had more than ***$21 billion*** in assets, making it one of the largest defined-contribution employee retirement plans in the United States. As a result, the Plan had available to it during the Class Period extraordinary bargaining power, economies of scale and leverage that it could have used to achieve fees far below those available to individual investors or even other ERISA plans with comparable investment strategies.

57.    In addition, plans with a large amount of assets can offer investment options with lower fees for participants by including various types of investment vehicles or classes of shares offered by funds.[13] For large plans, a common strategy to reduce fees charged to fund participants is to structure investment options as collective trusts or pooled separate accounts. Collective trusts, which are not available to retail investors and are regulated by the Office of the Comptroller of the Currency rather than the SEC, have simpler disclosure statements, smaller prospectuses, and lower advertising and marketing costs. Similarly, separate accounts are available to institutional investors and high net worth individuals, rather than retail investors, and have lower regulatory oversight and reporting and disclosure requirements. As a result, these investment structures can charge significantly lower fees than comparable mutual fund investment strategies. For example, according to a January 2016 report by State Street Global Advisors, collective trusts had expense ratios up to 30% lower than comparable mutual funds.[14]

**Defendants Breached Their Fiduciary Duties**

---

[12] *Id.* at 47.

[13] *See A Look at 401(k) Plan Fees*, *supra*, at 4, 8.

[14] *See* Michael Nelligan, *Collective Investment Trusts Lower Costs and Greater Flexibility*, State Street Global Advisors, Jan. 2016, at 3, *available at* https://www.ssga.com/investment-topics/defined-contribution/2016/CITs-Versus-Mutual-Funds.pdf.

58.     The Plan, which started in 1958, is presented to participants as "a great way to build savings for your future" with a "flexible, comprehensive investment fund lineup" and is currently available to most regularly paid (on a U.S. payroll) employees of JPMorgan and certain JPMorgan subsidiaries. Employees are eligible to participate in the Plan on the first day of their employment – and in some instances, employees are automatically enrolled in the Plan at 3% of compensation.

59.     Throughout the Class Period, the Plan generally offered investment options consisting of Target Date Funds and several core investment funds, which are composed of a mix of fixed-income, domestic equity, international and emerging market funds. Participants are also able to invest in the JPMorgan Chase Common Stock Fund. All amounts contributed to the Plan were held in a trust fund administered by JPM Bank, as trustee.

60.     For much of the Class Period, the Plan offered 30 investment options to Plan participants. Among these, 15 were managed by JPMorgan affiliates (thus, *half* of all options) and 7 by BlackRock, meaning that over *70*% of Plan investment options were affiliated with one of these two entities. Three of the Plan investment options were managed by JPMIM: the Core Bond Fund, the Mid Cap Growth Fund, and the Small Cap Core Fund. Each of these three funds were structured as mutual funds, and they had three of the six highest expense ratios of all the investment options in the Plan, as demonstrated by the following chart:

**Plan Gross Annual Expense Ratios 9/30/14**



61.    In addition, prior to June 14, 2013, the Plan offered the Growth and Income Fund, a mutual fund actively managed by JPMorgan Asset Management (USA) Inc., another JPMorgan affiliate. The Growth and Income Fund purchased institutional shares of the JPMorgan Value Opportunities Fund. As of March 31, 2012, the JPMorgan Value Opportunities Fund charged net annualized expenses of 0.65% for the institutional share class.

62.    As described herein, defendants breached their fiduciary duties under ERISA by engaging in self-dealing and acting to benefit themselves to the detriment of Plan participants by making half of all Plan investment options JPMorgan-affiliated funds, favoring a close business partner, BlackRock, and charging excessive fees for investment options in the Plan to the detriment

of plaintiff, the Plan and members of the Class.

***The Mid Cap Growth Fund***

63.     The Mid Cap Growth Fund was a Plan investment option managed by JPMIM. The Mid Cap Growth Fund invested in the JPMorgan Capital Growth Fund, a JPMorgan-affiliated actively managed mutual fund that invested primarily in the stocks of medium-sized companies (*i.e.*, generally those with a market capitalization of between $2 billion and $15 billion). As of September 30, 2014, the Mid Cap Growth Fund charged a gross annualized expense ratio of approximately 0.93%, after waiver, to Plan participants, making it the most expensive Plan investment option. The funds generated from these expenses flowed to affiliates of JPM Bank, JPMorgan and other Plan fiduciaries, to the detriment of plaintiff, the Plan and the Class.

64.     Fees charged to Plan participants for their investments in the Mid Cap Growth Fund were in excess of fees charged by other un-affiliated mutual funds using comparable strategies. For example, the Vanguard Mid-Cap Growth Fund had an annualized expense ratio of 0.43% – less than half of the expenses charged by the Mid Cap Growth Fund.[15] Furthermore, a passively managed fund could have been offered with a comparable mid cap growth investment strategy at a significantly lower price and with less volatility. For example, the Vanguard Mid-Cap Growth Index Fund Admiral had an annualized expense ratio of 0.08%, more than 90% less than what was charged by the Mid Cap Growth Fund. In addition, if the Plan had structured the Mid Cap Growth Fund as a collective trust or separate account instead of a mutual fund, it could have lowered fees by 30% or more, because of the lower regulatory, recordkeeping and disclosure requirements of these pooled investment structures. Finally, given the size and bargaining power of the Plan, which had hundreds of millions of dollars in assets and was one of the largest defined contribution plans in the United States, defendants

---

[15] The list of comparable investment options alleged herein is not meant to be exhaustive, but instead to demonstrate the availability of significantly less-expensive alternatives. Given the unique size, bargaining power and leverage of the Plan, it could have negotiated far lower fees than were readily available to most investors, and even other ERISA plans, during the Class Period.

could have negotiated fees substantially below the fees ordinarily charged retail investors or even other 401(k) plans for the Mid Cap Growth Fund.

65.    After the SEC and the Office of the Comptroller of the Currency initiated their investigations in 2014 into the self-dealing and the improper favoring of proprietary investment products by JPM Bank and another JPMorgan affiliate, defendants belatedly began to lower the fees charged by the Mid Cap Growth Fund. Defendants changed these excessive fees because they were engaged in similar conflicts of interest and the improper favoring of affiliated investment managers with respect to the Mid Cap Growth Fund as was later revealed to have occurred by the SEC Order. In essence, defendants had been caught, and were belatedly attempting to mitigate legal and reputational risks flowing from the misconduct alleged herein.

66.    In November 2015, approximately one month before the imposition of a $307 million fine on JPMorgan affiliates for favoring JPMorgan-affiliated proprietary investment products, the Mid Cap Growth Fund was discontinued as an investment option in the Plan. In its place, defendants offered the S&P MidCap 400 Index, which was estimated to have an annualized gross expense ratio of 0.04%. This expense ratio was thus *96% lower* than the Mid Cap Growth Fund's expense ratio. Unfortunately for Plan participants, this belated change did nothing to redress the millions of dollars in excessive fees that they had been charged by the Mid Cap Growth Fund during the Class Period.

*The Small Cap Core Fund*

67.    The Small Cap Core Fund is a Plan investment option actively managed by JPMIM. The Small Cap Core Fund invests at least 80% of its total assets in the common stock of small-cap companies (*i.e.*, generally those with a market capitalization of under $1.5 billion at the time of investment). As of September 30, 2014, the Small Cap Core Fund charged a gross annualized expense ratio of approximately 0.82%, after waiver, to Plan participants, making it the second most expensive

Plan investment option. The funds generated from these expenses flowed to affiliates of JPM Bank, JPMorgan and other Plan fiduciaries, to the detriment of plaintiff, the Plan and the Class.

68.    Fees charged to Plan participants for their investments in the Small Cap Core Fund were in excess of fees charged by other mutual funds using comparable strategies. For example, the DFA US Small Cap I Fund had an expense ratio of 0.37% – less than half of the expenses charged by the Small Cap Core Fund. In addition, if the Plan had structured the Small Cap Core Fund as a collective trust or separate account instead of a mutual fund, it could have lowered fees by 30% or more, because of the lower regulatory, recordkeeping and disclosure requirements of these pooled investment structures. Finally, given the size and bargaining power of the Plan, which had hundreds of millions of dollars in assets and was one of the largest defined contribution plans in the United States, defendants could have negotiated fees substantially below the fees ordinarily charged retail investors or even other 401(k) plans for the Small Cap Core Fund.

69.    After the SEC and the Office of the Comptroller of the Currency initiated their investigations in 2014 into the self-dealing and the improper favoring of proprietary investment products by JPM Bank and another JPMorgan affiliate, defendants belatedly began to lower the fees charged by the Small Cap Core Fund. Defendants changed these excessive fees because they were engaged in similar conflicts of interest and the improper favoring of affiliated investment managers with respect to the Small Cap Core Fund as was later revealed to have occurred by the SEC Order. In essence, defendants had been caught, and were belatedly attempting to mitigate legal and reputational risks flowing from the misconduct alleged herein.

70.    In December 2015, the same month as the imposition of a $307 million fine on JPMorgan affiliates for favoring JPMorgan-affiliated proprietary investment products, defendants converted the Small Cap Core Fund from a mutual fund to a separate account format. Because of the excessive nature of the previous expense charges and the considerable cost savings afforded by this

change, defendants eliminated entirely the fees charged to Plan participants for their investments in the Small Cap Core Fund at this time. Unfortunately for Plan participants, this belated change did nothing to redress the millions of dollars in excessive fees that they had been charged by the Small Cap Core Fund during the Class Period.

### The Core Bond Fund

71.    The Core Bond Fund is a Plan investment option currently managed by JPM Bank and previously actively managed by JPMIM. The Core Bond Fund invests in debt securities rated as investment grade or unrated debt securities of comparable quality, as well as preferred stocks and loan participations. As of September 30, 2014, the Core Bond Fund charged a gross annualized expense ratio of approximately 0.40%, after waiver, to Plan participants, making it the sixth most expensive investment option, and the most expensive bond investment option, in the Plan. The funds generated from these expenses flowed to affiliates of JPM Bank, JPMorgan and other Plan fiduciaries, to the detriment of plaintiff, the Plan and the Class.

72.    Fees charged to Plan participants for their investments in the Core Bond Fund were in excess of fees charged by other mutual funds using comparable strategies. For example, the Vanguard Core Bond Fund Admiral Shares has an expense ratio of 0.15% – less than half of the expenses charged by the Core Bond Fund. Furthermore, a passively managed fund could have been offered with a comparable bond investment strategy at a significantly lower price and with less volatility. For example, the Vanguard Total Bond Market Index Fund Admiral Shares had an annualized expense ratio of 0.06%, 85% less than what was charged by the Core Bond Fund. In addition, if the Plan had structured the Core Bond Fund as a collective trust or separate account instead of a mutual fund, it could have lowered fees by 30% or more, because of the lower regulatory, recordkeeping and disclosure requirements of these pooled investment structures. Finally, given the size and bargaining power of the Plan, which had hundreds of millions of dollars in assets and was

one of the largest defined contribution plans in the United States, defendants could have negotiated fees substantially below the fees ordinarily charged retail investors or even other 401(k) plans for the Core Bond Fund.

73.     After the SEC and the Office of the Comptroller of the Currency initiated their investigations in 2014 into the self-dealing and the improper favoring of proprietary investment products by JPM Bank and another JPMorgan affiliate, defendants belatedly began to lower the fees charged by the Core Bond Fund. Defendants changed these excessive fees because they were engaged in similar conflicts of interest and the improper favoring of affiliated investment managers with respect to the Core Bond Fund as was later revealed to have occurred by the SEC Order. In essence, defendants had been caught, and were belatedly attempting to mitigate legal and reputational risks flowing from the misconduct alleged herein.

74.     In March 2016, approximately three months after the imposition of a $307 million fine on JPMorgan affiliates for favoring JPMorgan-affiliated proprietary investment products, defendants converted the Core Bond Fund from a mutual fund to a collective trust format. Because of the excessive nature of the previous expense charges and the considerable cost savings afforded by this change, defendants eliminated entirely the fees charged for the Core Bond Fund. Because of the excessive nature of the previous expense charges and the considerable cost savings afforded by this change, defendants eliminated entirely the fees charged to Plan participants for their investments in the Core Bond Fund at this time. Unfortunately for Plan participants, this belated change did nothing to redress the millions of dollars in excessive fees that they had been charged by the Core Bond Fund during the Class Period.

***The Growth and Income Fund***

75.     The Growth and Income Fund was a Plan investment option actively managed by JPMorgan Asset Management (USA) Inc., a JPMorgan affiliate. The Growth and Income Fund

purchased the institutional shares of the JPMorgan Value Opportunities Fund, which invested at least 80% of its assets in equity securities of mid and large-capitalization stocks at the time of purchase that were believed to be undervalued. As of March 31, 2012, the JPMorgan Value Opportunities Fund charged net annual operating expenses of 0.65% for the institutional share class. The funds generated from these expenses flowed to affiliates of JPM Bank, JPMorgan and other Plan fiduciaries, to the detriment of plaintiff, the Plan and the Class.

76.     Fees charged to Plan participants for their investments in the Growth and Income Fund were in excess of fees charged by other mutual funds using comparable strategies. For example, the Vanguard U.S. Value Fund Investor Shares had an expense ratio of 0.29% – less than half of the expenses charged by the Growth and Income Fund. Furthermore, a passively managed fund could have been offered with a comparable value investment strategy at a significantly lower price and with less volatility. For example, the Vanguard Value Index Fund Admiral Shares had an annualized expense ratio of 0.10%, approximately 85% less than what was charged for institutional shares in the Growth and Income Fund. In addition, if the Plan had structured the Growth and Income Fund as a collective trust or separate account instead of a mutual fund, it could have lowered fees by 30% or more, because of the lower regulatory, recordkeeping and disclosure requirements of these pooled investment structures. Finally, given the size and bargaining power of the Plan, which had hundreds of millions of dollars in assets and was one of the largest defined contribution plans in the United States, defendants could have negotiated fees substantially below the fees ordinarily charged retail investors or even other 401(k) plans for the Growth and Income Fund.

77.     In June 2013, the Plan eliminated the Growth and Income Fund for Plan participants, and shifted all assets in that fund to the Large Cap Value Index Fund, an index fund passively managed by BlackRock. As of September 2014, fees for the Large Cap Value Index Fund were 0.07%. Fees were again reduced in April 2016, and total annualized expenses for the Large Cap Value Index Fund

are now estimated to be 0.04% for 2017, more than *93%* below the expense ratio for the institutional shares of the JPMorgan Value Opportunities Fund. Unfortunately for Plan participants, this belated change did nothing to redress the millions of dollars in excessive fees that they had been charged by the Growth and Income Fund during the Class Period.

*Additional Investment Options*

78.    While the Mid Cap Growth Fund, Small Cap Core Fund, Core Bond Fund and Growth and Income Fund were among the most egregious examples of self-dealing and excessive fee charges in the Plan, defendants chose to slash fees for almost *every* JPMorgan and BlackRock affiliated investment option in the Plan following the intense scrutiny by federal regulators beginning in 2014, which eventually uncovered wrongdoing with respect to JPM Bank's preference for proprietary funds, self-dealing and the promotion of third-party funds in which it was self-interested. The following table shows the dramatic difference in the fees and expenses charged to Plan participants for affiliated investment options before and after JPMorgan's self-dealing was revealed by the SEC Order:

| Fund Name | Manager | 9/30/14 Annualized Expense Fee | 1/1/17 Annualized Expense Fee (Est.) | % Reduction in Fees |
|---|---|---|---|---|
| Target Date Income | JPM Bank | 0.11% | 0.08% | *27%* |
| Target Date 2015 | JPM Bank | 0.10% | 0.06% | *40%* |
| Target Date 2020 | JPM Bank | 0.09% | 0.06% | *33%* |
| Target Date 2025 | JPM Bank | 0.09% | 0.06% | *33%* |
| Target Date 2030 | JPM Bank | 0.09% | 0.06% | *33%* |
| Target Date 2035 | JPM Bank | 0.09% | 0.06% | *33%* |
| Target Date 2040 | JPM Bank | 0.10% | 0.06% | *40%* |
| Target Date 2045 | JPM Bank | 0.10% | 0.06% | *40%* |
| Target Date 2050 | JPM Bank | 0.10% | 0.06% | *40%* |
| Target Date 2055 | JPM Bank | N/A | 0.06% | *N/A* |
| Short-Term Fixed Income | JPM Bank | N/A | N/A | *N/A* |
| Stable Value | JPM Bank | 0.22% | 0.21% | *5%* |
| Core Bond | JPMIM (changed to JPM Bank) | 0.40% (after waiver) | 0% | *100%* |
| Large Cap Value Index | BlackRock | 0.07% | 0.04% | *43%* |
| S&P 500 Index | BlackRock | 0.04% | 0.02% | *50%* |
| Large Cap Growth Index | BlackRock | 0.07% | 0.04% | *43%* |
| Mid Cap Growth | JPMIM | 0.93% (after waiver) | (removed – *see* S&P MidCap 400 Index) | *(removed)* |
| S&P MidCap 400 Index | State Street | N/A | 0.04% | *(see above)* |
| Small Cap Index | BlackRock | 0.10% | 0.05% | *50%* |
| Small Cap Core | JPMIM | 0.82% (after waiver) | 0% | *100%* |
| Int'l Large Cap Index | BlackRock | 0.10% | 0.08% | *20%* |
| Int'l Small Cap Index | BlackRock | 0.16% | 0.12% | *25%* |
| Emerging Market Equity Index | BlackRock | 0.18% | 0.14% | *22%* |
| JPMorgan Common Stock | N/A | N/A | N/A | *N/A* |

79.    Notably, although fees were reduced by as much as 100% for investment options affiliated with JPMorgan or JPMorgan's close business associate, BlackRock, following the start of the regulatory investigations detailed herein, fees remained virtually unchanged, and in one case

actually *increased*, for the few investment options that were not associated with either of these conflicted entities during this same time frame, as demonstrated by the following table:

| Fund Name | Manager | 9/30/14 Annualized Expense Fee | 1/1/17 Annualized Expense Fee (Est.) | % Reduction in Fees |
|---|---|---|---|---|
| Govt. Inflation-Protected Bond | PIMCO | 0.23% | 0.23% | *0%* |
| Intermediate Bond | PIMCO | 0.23% | 0.23% | *0%* |
| High Yield Bond | Columbia Mgmt. | 0.36% | 0.36% | *0%* |
| Large Cap Value | T. Rowe Price | 0.35% | 0.35% | *0%* |
| Large Cap Growth | Wellington Mgmt. | 0.41% | 0.41% | *0%* |
| Mid Cap Value | Earnest Partners | 0.42% | (removed – *see* S&P MidCap 400 Index) | *(removed)* |
| Small Cap Blend | Jennison Associates | 0.62% | 0.63% | *+2%* |
| Int'l Large Cap Value | Causeway Capital Mgmt. | 0.32% | 0.32% | *0%* |

80.    That expenses for the JPMorgan and BlackRock affiliated funds were significantly reduced only *after* the SEC and other government agencies began their investigation into JPM Bank's improper preference for JPMorgan-affiliated funds and third-party funds in which JPMorgan is self-interested, while funds not affiliated with the JPMorgan or BlackRock did not see similar fee changes, indicates that defendants were engaged in the same self-dealing with respect to the Plan as was revealed by the SEC Order.

81.    Defendants could have offered the same, or very nearly the same, investment options in the Plan at a significantly reduced price to Plan participants, as is evidenced by defendants' belated expense reductions and the numerous alternatives available in the market. Defendants could have offered Plan participants: (1) cheaper mutual fund options employing similar strategies; (2) passively managed funds that employed similar strategies to the actively managed funds but at a reduced cost; (3) options structured as collective trusts and separately managed accounts, rather than more expensive

mutual fund options; and (4) options that utilized the Plan's immense leverage, economies of scale and bargaining power as one of the largest defined contribution plans in the United States. This is what a prudent and loyal Plan fiduciary, which was truly engaged in arm's-length negotiations in the Plan's best interests, would have done. Instead, defendants chose to load the Plan with proprietary funds and the funds of a favored business partner, BlackRock, which charged excessive fees out of proportion with the size of the Plan, prudent investment options and the alternatives available in the market.

82.     As a result of defendants' disloyalty and imprudence, Plan participants were forced to pay fees that were ***more than 90% higher*** for actively managed mutual funds than they could have paid for more reasonably priced comparable investments, and as much as ***50% higher*** for other types of Plan investments. Consequently, Plan participants have lost tens of millions of dollars of their retirement savings during the Class Period in fees that have flowed to defendants and their affiliates. This harm has been, and will continue to be until redressed, compounded over time as it has reduced the investment capital available to Plan participants, and significantly diminished the savings that Plan participants – JPMorgan's own employees – will have available at retirement.

## CLASS ACTION ALLEGATIONS

83.     Plaintiff brings this action in this representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and a Class defined as follows:

> All participants in the JPMorgan Chase 401(k) Savings Plan from March 2, 2011 to the date of Judgment (the "Class Period"). Excluded from the Class are defendants and their families, the officers and directors of JPMorgan, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

84.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of January 1, 2015, the Plan had over 280,000 participants.

85.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include, *inter alia*:

(a)    whether defendants are fiduciaries of the Plan;

(b)    whether defendants breached their fiduciary duties of loyalty and prudence with respect to the Plan;

(c)    whether defendants had a duty to monitor other fiduciaries of the Plan;

(d)    whether defendants breached their duty to monitor other fiduciaries of the Plan; and

(e)    the extent of damage sustained by Class members and the appropriate measure of damages.

86.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

87.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action litigation. Plaintiff has no interests that conflict with those of the Class.

88.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Breach of Duties of Prudence and Loyalty
### Against All Defendants

89.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

- 33 -

90.    All defendants were fiduciaries of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

91.    Section 1104 of ERISA imposes fiduciary duties of prudence and loyalty upon the defendants in their administration of the Plan and in their selection and monitoring of the Plan's investments.

92.    The scope of the fiduciary duties and responsibilities of defendants includes managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence and prudence required by ERISA. Further, defendants were directly responsible for ensuring that the Plan's fees were reasonable, selecting and retaining prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets were invested prudently. This duty is "a continuing duty to monitor investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1829.

93.    As described throughout the Complaint, defendants failed to monitor the Plan's investments to ensure that each of these investments remained prudent, and failed to remove those investments that were no longer prudent. Specifically, defendants retained investment options that charged excessive fees that benefitted affiliated entities, rather than Plan participants, despite the availability of lower cost alternatives as detailed herein. A prudent fiduciary in possession of this information would have removed these investment options, replaced them with more prudent and lower cost alternatives, and/or used the size, leverage and bargaining power of the Plan, which is one of the largest defined contribution plans in the United States, to secure significantly reduced fees for comparable investment strategies.

94.    Each of the above-mentioned imprudent actions and omissions illustrate defendants' failures to monitor the Plan and make investment decisions based solely on the merits of each

investment and the best interests of the Plan and its participants. Defendants' conduct and decisions were influenced by their desire to drive revenues and profits to JPMorgan and its affiliates and business partners. Through these actions and omissions, defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duties of loyalty and prudence under 29 U.S.C. §1104(a).

95.    Defendants knowingly participated in each fiduciary breach of the other defendants, knowing that such acts were a breach, and enabled the other defendants to commit fiduciary breaches by failing to lawfully discharge their own duties. Defendants knew of the fiduciary breaches of the other defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. §1105(a).

96.    As a direct and proximate result of these breaches, the Plan, plaintiff and members of the Class lost millions of dollars in the form of higher fees and lower returns on their investments than they would have otherwise experienced.

97.    Pursuant to ERISA §502(a)(2) and (a)(3), and ERISA §409(a), 29 U.S.C. §1132(a)(2) and (a)(3), and 29 U.S.C. §1109(a), defendants are liable to disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by their breaches of the duties of loyalty and prudence, and such other appropriate equitable relief as the Court deems proper.

## COUNT II

### For Breach of Duty to Monitor
### Against the Director Defendants

98.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

99.     The Director Defendants had overall oversight responsibility for the Plan and control over the Plan's investment options through their authority to limit or remove the other fiduciary defendants. The Director Defendants had the authority to select the members of the Plan Selection Committee, who in turn selected the members of EPIC through which the Plan's investment options were selected and the Plan's assets were invested and managed. The Director Defendants therefore had a fiduciary responsibility to monitor the performance of the fiduciaries operating under them.

100.    Pursuant to their overall oversight responsibility and control of the Plan, the Director Defendants were responsible for establishing and administering rules and procedures with respect to all matters arising under the Plan, including the conduct of the Plan Selection Committee and EPIC and their constituent members in selecting, overseeing and retaining investment options available under the Plan. These defendants were further responsible for monitoring the performance of all JPMorgan and JPM Bank employees who performed functions for the Plan.

101.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

102.    To the extent the Director Defendants delegated fiduciary monitoring responsibilities to other fiduciary defendants, each defendant's monitoring duty included an obligation to ensure that any delegated tasks were performed prudently and loyally.

103.    The Director Defendants breached their fiduciary monitoring duties by, among other things:

(a)    failing to monitor and evaluate the performance of other fiduciary defendants or have a system in place for doing so, standing idly by as the Plan suffered losses as a result of other defendants' election to continue to pay fees that were significantly higher than what the Plan could have paid for a substantially identical investment products readily available elsewhere, as detailed herein;

(b)    failing to monitor the processes by which the Plan's investments were evaluated, which would have alerted a prudent fiduciary to the preferential treatment defendants gave to JPMorgan- and BlackRock-affiliated funds out of self-interest, and not based on the best interest of the Plan's participants; and

(c)    failing to remove fiduciaries whose performance was inadequate in that they continued to maintain costly and self-serving investments in the Plan, all to the real and substantial detriment of the Plan and the Plan's participants' retirement savings, including plaintiff and members of the Class.

104.    As a direct and proximate result of these breaches of the duty to monitor, the Plan, plaintiff and members of the Class lost millions of dollars in the form of higher fees and lower returns on their investments than they would have otherwise experienced.

105.    Pursuant to ERISA §502(a)(2) and (a)(3), and ERISA §409(a), 29 U.S.C. §1132(a)(2) and (a)(3), and 29 U.S.C. §1109(a), defendants are liable to disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by their breaches of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.       Determining that this action is a proper class action and certifying plaintiff as a Class

Representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as

Lead Counsel;

B.       Declaring that defendants, and each of them, have breached their fiduciary duties

under ERISA;

C.       Awarding plaintiff and the members of the Class damages, including interest;

D.       Awarding plaintiff's reasonable costs and attorneys' fees;

E.       Disgorgement of all revenues received from, or in respect of, the Plan by way of

fiduciary breach; and

F.       Awarding such equitable, injunctive or further relief as the Court may deem equitable

and just.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 30, 2017                           Respectfully submitted,


**LEVI & KORSINSKY LLP**

*BY:  /s/ Nancy A. Kulesa*
Nancy A. Kulesa (NK 2015)
Shannon L. Hopkins (SH-1887)
Stephanie Bartone
733 Summer Street, Suite 304
Stamford, CT 06901
Tel.: (212) 363-7500
Fax: (866) 367-6510
Email: shopkins@zlk.com
Email: nkulesa@zlk.com
Email: sbartone@zlk.com

*Counsel for Plaintiff James C. Mohaghan*

- 38 -